IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| **HIGHLAND CAPITAL BROKERAGE, INC.,** | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| vs. | ) ) ) | |
| **JOHN RIGGS,** | ) ) ) | |
| **SERVE AT:** | ) ) ) | |
| **819 Nirk Avenue**<br>**Kirkwood, MO 63122,** | ) ) ) | |
| Defendant. | ) ) | |

## <u>VERIFIED COMPLAINT</u>

COMES NOW Plaintiff Highland Capital Brokerage, Inc. ("HCB") by and through its counsel, Littler Mendelson, P.C., and for its cause of action against Defendant John Riggs ("Riggs") alleges and states as follows:

## <u>NATURE OF THE ACTION</u>

1.      This case is one piece of a larger effort by HCB's competitor, Lion Street, to attempt to grow its business by raiding HCB's talent, confidential information, and trade secrets.  Riggs is a former Senior Vice President of HCB, and worked for HCB from August 31, 2004 through April 8, 2020.  On April 8, Riggs and other Senior Vice Presidents of HCB abruptly resigned, with others to follow not long after.  A search of Riggs's computer following his exit revealed that he deleted <u>thousands</u> of emails prior to leaving, purged (or attempted to purge) many emails from the HCB network, and tried to delete <u>thousands</u> of documents from the HCB network.  Moreover, Riggs

stole and misappropriated <u>hundreds</u> of HCB documents to his personal IOS device prior to leaving HCB.

2.     After Riggs's resignation, HCB also learned that he was soliciting work through Wells Fargo, an active client of HCB.  HCB believes Riggs has, and continues to solicit additional work on behalf of Wells Fargo and other HCB clients during the six weeks since he left HCB.

3.     Riggs's actions are in blatant disregard of his contractual and other legal obligations to HCB.  His effort to purge and delete data and emails from HCB in the days and weeks leading to his planned exit, were steps taken by him to conceal his efforts to take HCB's clients and to harm HCB.  Further, Riggs misappropriated hundreds of documents including HCB's confidential client list, private and confidential information about active work for clients, and confidential earnings information for Senior Vice Presidents at HCB.

4.     Riggs's work on behalf of Wells Fargo, and likely other active HCB clients, directly violates the valid and binding Employment Agreement he executed on August 31, 2004.

5.     Further, HCB goes to great lengths to protect the information stolen by Riggs, by, among other things, requiring all employees who have access to such information (including Riggs) to enter into confidentiality agreements.  Riggs's unlawful taking of such information violated his contractual commitments to HCB, his duty of loyalty, and Missouri law.

6.     In this action HCB seeks, inter alia, temporary, preliminary, and permanent injunctive relief to enforce promises made by Riggs, and to prevent Riggs and his new employer, Lion Street, from misappropriating HCB's confidential, proprietary, and trade secret information.

## PARTIES, JURISDICTION AND VENUE

7.     HCB is engaged in the high-end life insurance business.  It operates as an intermediary between various life insurance companies and retail life insurance brokers who are

2

attempting to secure life insurance coverage for their high net-worth clients.  HCB also operates as an intermediary between various life insurance companies and institutional clients who wish to secure life insurance for their customers.  HCB's customers are the retail life insurance brokers and institutional clients, who in turn seek high-end life insurance products for their respective affluent clients.  HCB is an organization organized and existing under the laws of Delaware, with its principal place of business in Birmingham, Alabama.

8.     Riggs is a former employee of HCB and, upon information and belief, a citizen of the State of Missouri who resides in St. Louis, Missouri.

9.     This Court has jurisdiction over this matter on the basis of diversity jurisdiction. Pursuant to 28 U.S.C. § 1332, District Courts have original jurisdiction of all actions where the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and in which there is complete diversity of citizenship among the parties.

10.     For purposes of diversity jurisdiction, a corporation is deemed to be a citizen of the State in which it was incorporated and the State where it has its principal place of business. 28 U.S.C. § 1332(c)(1).  HCB is a citizen of Delaware and Alabama for diversity purposes.

11.     Accordingly, there is complete diversity of citizenship between Riggs and HCB, and the diversity of citizenship requirement is met.

12.     Diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) also requires the amount in controversy, exclusive of interests and costs, to be in excess of $75,000.  HCB's estimated damages exceed this threshold amount.  These include potential and lost accounts from clients Riggs has improperly solicited, the value of the information he has taken, the cost of forensic investigation, and training provided to Riggs.

13.     This Court also has original jurisdiction of this action, pursuant to 28 U.S.C. § 1331.

3

14.    Riggs is a resident of St. Louis County, Missouri and the actions giving rise to this lawsuit occurred in St. Louis, Missouri.  Pursuant to 28 U.S.C. §1391(b), venue is proper in this Court.

## FACTS COMMON TO ALL COUNTS

### HCB and Lion Street are Competitors

15.    HCB is engaged in the high-end life insurance business.  The life insurance business, particularly for high-end, affluent clientele, is extremely competitive.

16.    Lion Street is in the insurance business, and primarily works in the retail insurance market.  Upon information and belief, Lion Street seeks to enter the life insurance brokerage business, but does not have the necessary contacts, customer relationships, and expertise to be successful in this high-end insurance industry.

17.    In 2019, premium life insurance made up only 18% of Lion Street's insurance business. *See* Lion Street's 2019 Annual Report.  Despite appearing to have existing relationships with a handful of large insurance partners, Lion Street did not have the contacts within those organizations to work on high-end life insurance cases.

18.    Instead of developing its own talent, Lion Street raided HCB in 2020, convincing Riggs and three of his Senior Vice President colleagues to work for them.

19.    HCB was founded in 1997 and quickly became a leader in the high-end insurance industry.  HCB invests tremendous resources in developing relationships with companies like Wells Fargo, and their individual financial advisors, for the purpose of cultivating business.

20.    Lion Street seeks to achieve the same level of success HCB has had developing these relationships and tools for over twenty years, only its strategy to do so is by raiding HCB's employees.

4

### Riggs's Employment With HCB

21.     HCB hired Riggs as a Sales Vice President in August, 2004.

22.     HCB has a network of salespeople throughout the country, and Riggs was positioned in St. Louis, Missouri.

23.     HCB invested a substantial amount of time, effort, and money in training Riggs so he could learn about this highly specialized business, and succeed at his job.  HCB hosts two annual in-person meetings (January & September) for the entire company and provides regional opportunities.

24.     HCB has institutional business relationships that take years of effort to cultivate, and access to which is managed at a corporate level.  By way of example, Wells Fargo has been a client of HCB's since 2001.   Riggs benefitted directly from these institutional business relationships.  A significant portion of Riggs's revenue generated over the last five years (66%) was received from institutional business relationships.  These institutional business relationships were only available to Riggs because of HCB's ability to pass stringent audit and regulatory guidelines, and because of the enormous expense and effort invested in cultivating those relationships. The audit and regulatory guidelines, alone, require significant investment and efforts on behalf of HCB from an operational, technological and security perspective.

25.     HCB also invested heavily in the financial support of Riggs so he could build his network.  HCB absorbs almost 100% of all overhead for its salespeople, including Riggs.  This overhead includes the costs of case design, case support, underwriting, and case management.

26.     Riggs successfully used resources available to him at HCB to develop relationships with clients, and to earn significant compensation.

## HCB Entrusted Riggs With Its Proprietary, Confidential, and Trade Secret Information

27.     By virtue of his job duties and position, and in order to perform his duties at HCB, Riggs had access to, was exposed to, and relied upon HCB's confidential, proprietary, and trade secret information.

28.     Over the years, HCB has invested a great deal of time and money in developing, cultivating, and maintaining relationships with its retail insurance brokers and institutional clients. HCB prides itself on providing services to insurance brokers and institutional clients that match the individual customer's life insurance needs at competitive prices.  Sales Vice Presidents at HCB are expected to develop and maintain close business relationships with HCB's retail insurance brokers and clients, to competitively structure and quote life insurance coverage and services that meet their needs.

29.     To accomplish these goals, HCB provides its Sales Vice Presidents with resources and opportunities to interact closely with various life insurance companies, insurance brokers, and institutional clients.  Sales Vice Presidents are expected to develop an understanding of the available life insurance products and services, as well as customers' individual coverage requirements and preferences.  But for their employment with HCB, the Sales Vice Presidents would not interact and do business with HCB's brokers and institutional clients.

30.     HCB invests a substantial amount of time and resources in developing and maintaining its insurance brokers and institutional client base.  The establishment, cultivation, and maintenance of relationships with the insurance brokers and institutional clients is critical to and the life blood of HCB's business.  As a result of HCB's investment, as well as its reputation, exceptional services, and expertise in the industry, it has developed long-standing relationships with its insurance brokers and institutional clients, and relies on substantial repeat business.  HCB

6

develops, compiles, and maintains extensive information about its insurance brokers, institutional clients, and their respective customers, and zealously protects that information. For example, HCB gathers confidential information regarding potential leads and client lists, including information regarding the expiration of the clients' policies, the amount or value of provided insurance, the premiums paid on the policies, key (and otherwise private) contact information for its clients, and data regarding clients' unique requirements and special needs, as a result of years of targeted research, marketing, and client development (hereinafter "Confidential Information"). Without these relationships, HCB would not be able to perform its business functions. These relationships are a valuable and critical asset of HCB's business, so much so, that HCB requires individuals with access to this information to sign and abide by a Confidentiality Agreement. This information is not known by third parties outside of HCB and cannot be compiled and organized through public resources.

31.     HCB also maintains records of its employees' computer usernames and passwords, personnel and payroll records, marketing materials, profit margins, financials, notes, memoranda, forms, records, data, charts, orders and quotes, customers' contact information, policies, procedures, and preferences, and information relating to HCB's services, operations, policies, and strategies. HCB's Confidential Information is regularly updated by HCB and is the product of years of work. HCB's Confidential Information has been developed at a substantial cost, and HCB derives economic value from the fact that it is not known outside of HCB and is not available through public records and information sources. HCB's Confidential Information cannot be independently developed by its competitors without great effort and expense, if at all.

32.     The aforementioned information has significant economic value to HCB and would be of significant economic value to its competitors, especially those competitors – like Lion Street

– looking to "grow" their business and/or expand to markets where they would compete against HCB. Riggs would not have had access to any of this Confidential Information were it not for his employment at HCB, and his actions to destroy and/or take this data are violations of Missouri and Illinois law, and his Employment Agreement.

**Riggs's Nondisclosure Agreement**

33.     To protect HCB's confidential, proprietary, and trade secret information, the goodwill HCB has built with its employees and customers, and its investment in the employees it trained and financially supported, HCB required Riggs, as a condition of his employment with HCB, to execute a non-disclosure agreement.

34.     The Employment Agreement signed by Riggs on August 31, 2004 (the "Agreement"), includes confidentiality and non-disclosure obligations. A copy of the Agreement is attached as **Exhibit A**.

35.     The Agreement is a valid and enforceable contract, and is incorporated by this reference as if fully set forth herein.

36.     In the Agreement, Riggs acknowledged that during his employment he would receive "Proprietary Information that is confidential and that greatly affects the successful conduct of Highland Capital Brokerage's business and goodwill." Exhibit A, pg. 8. He further acknowledged that the Proprietary Information was provided to him in confidence so that he could perform his job duties. *Id.*

37.     Proprietary Information is defined in the Agreement as:

> Any and all of clients, employees and independent contractors lists or other trade secrets or other confidential information pertaining to the financial condition, business affairs, or business prospects of Highland Capital Brokerage or its affiliates, and any and all slogans, texts, ideas, practices, processes, systems, products, improvement and developments, whether or

8

not published, protected, or susceptible of protection by copyright, patent, trademark, or any form of legal protection. *Id*.

38. Riggs further acknowledged that the Proprietary Information had significant value and that if it were made available to others it would irreparably damage HCB's business. *Id*. Further, Riggs agreed that "disclosure of Proprietary Information, whether directly or indirectly, including copying or removing of any of Highland Capital Brokerage's records, except in the normal course of business or with Highland Capital Brokerage's express consent, would be deemed material and would result in immediate and irreparable injury to Highland Capital Brokerage not properly or completely remediable by damages in an action at law." *Id*.

39. The non-disclosure agreement further provides that HCB may apply to a court to enjoin any violation, and to recover all costs of such action, including reasonable attorneys' fees.

40. As set forth below, Riggs misappropriated Proprietary Information in flagrant violation of the Agreement.

### Riggs's Non-Solicitation Agreement

41. The Agreement also contains a Non-Solicitation provision:

> During your employment and for twenty-four (24) months after your employment ends, you will not (i) directly or indirectly solicit the business of any past or present client of Highland Capital Brokerage, except on Highland Capital Brokerage's behalf, or (ii) serve as an employee, consultant, or agent of or an advisor to any past or present client. This includes any person who is an advisee, customer or client of Highland Capital Brokerage and anyone who has been an advisee, customer or client of Highland Capital Brokerage within the last two (2) years. It also includes any person or entity to which or through which Highland Capital Brokerage has offered to sell or provide insurance products or investment products within the prior two (2) years. It does not include those people or entities listed on Exhibit C who are insurance agents or personal clients that you have serviced on behalf of another employee before the date of this Agreement.

Ex. A, § 4.1.

42.     Exhibit C to the Agreement identifies A.G. Edwards, Stifel Nicholas, and Morgan Stanley as those insurance agents or personal clients not subject to § 4.1 of the Agreement.

43.     As described more fully below, Riggs has and continues to violate the Non-Solicitation provision of his Agreement with entities not listed on Exhibit C to the Agreement.

44.     The Non-Solicitation provision further provides that for a period of two years after his employment ends, Riggs will not take any action to cause HCB to lose any customers, clients, suppliers, or business relationships.  Ex. A, § 4.2.

45.     Lastly, the Non-Solicitation provision explicitly provides: "You and Highland Capital Brokerage agree that the time limits of this Section 4 are reasonable, in view of the scope and nature of Highland Capital Brokerage's business, your knowledge of Highland Capital Brokerage's business, and your relationships with Highland Capital Brokerage's past, present, and potential clients."  Ex. A, § 4.3.

### Riggs's Theft of Trade Secret Information

46.     On April 8, 2020, Riggs abruptly resigned from HCB.  HCB quickly learned that Riggs and several other Sales Vice Presidents were going to work for Lion Street.  On March 25, 2020, Riggs had an appointment on his calendar for an "Offer Letter Meeting" with James Joyce at Lion Street, and several other HCB employees.  It is clear that by this time he was negotiating the terms of his exit and, simultaneously, taking HCB's confidential and proprietary trade secret information so that he could improperly use it in his new position.

47.     In the weeks and days leading up to his resignation, Riggs not coincidentally began downloading **hundreds of pages of HCB confidential, proprietary, and trade secret information** to his personal IOS device.

48. For example, Riggs downloaded a confidential and proprietary spreadsheet containing all the contact information for individuals at various carriers who are clients of HCB. The information contained on the spreadsheet is data he would not have access to but for his employment at HCB. The contact information and other data contained on the document is the culmination of HCB's long-term efforts to make these connections and develop relationships with specific carriers, and their employees. It is proprietary data that is closely guarded by HCB.

49. By way of further example, Riggs downloaded confidential and proprietary documents showing his active cases as of March 2020. These documents contain confidential client information and, again, he would not have access to this information but for his employment with HCB.

50. Riggs also downloaded <u>over 100 documents</u> related to illustrations he was working on for clients of HCB. These documents contain personal information about individuals seeking to obtain life insurance, and the policies he assists the client to obtain. As with the other documents, these are confidential and proprietary, and he would not have had access to these clients, or this information, but for his employment at HCB.

51. Riggs downloaded information about all Sales Vice President's sales data, which is also confidential and proprietary data.

52. The documents taken by Riggs in the days leading up to his resignation demonstrate clearly his desire to take HCB's carefully guarded client lists and contact information, and his plan to continue working on matters that belong at HCB, once he was at Lion Street.

53. The data taken by Riggs is not available to the public, and would be highly valuable to any competitor looking to "grow" its business, like Lion Street.

54.     Riggs had no legitimate business reason to transfer these extensive amounts of confidential and proprietary information to his private IOS device.  As to all of the above, Riggs transmitted this information to his personal device for purposes unrelated to his responsibilities at HCB, as clearly evidenced by the takings that occurred on the eve of his resignation to go and work for a would-be competitor and by the nature of the documents he took.  Riggs's intent is further evidenced by the fact that his taking documents is coupled with overt steps to purge and delete data from HCB, as detailed below.

55.     In this position, Riggs has the same or similar duties with Lion Street that he had as a Sales Vice President for HCB, and is inevitably using and/or disclosing HCB's confidential, proprietary, and trade secret information to unfairly compete, on behalf of Lion Street, against HCB.

56.     In addition, by virtue of his position with Lion Street, Riggs will cause the inevitable disclosure of HCB's confidential, proprietary, and trade secret information in violation of the Agreement.

**Riggs's Violation of his Non-Solicitation Agreement**

57.     On May 11, 2020, M.R., an advisor at Wells Fargo, contacted Riggs at his HCB email address.  M.R.'s email asked Riggs to run quotes for a $300,000.00 life insurance policy for an individual.

58.     As Riggs was no longer working for HCB, another Sales Vice President contacted M.R. by way of introduction, and to request additional information to complete the requested illustration.

59.    M.R. informed HCB that after she sent her email, she remembered Riggs had moved to Lion Street.  She had already emailed him there, and he had completed the requested illustration.

60.    Riggs's actions advising M.R. that he had changed companies, and agreeing to perform work for her, are in direct violation of the Agreement.  Wells Fargo is not one of the several companies listed on Exhibit C to the Agreement, for whom Riggs is permitted to continue to work with, and, therefore, he is prohibited from agreeing to do this work.

61.    Since M.R. knew about Riggs's new employment, HCB is confident he has advised all his contacts (including the many whose information he misappropriated from HCB) and is working, or attempting to secure work from, all of them.

62.    HCB's counsel sent Riggs a letter on April 8, 2020, reminding him of his obligations under the Employment Agreement, which he has, and continues to, ignore.  *See* Ex. B.

### Riggs's Attempted Deletion and Destruction of HCB Documents

63.    Riggs was not satisfied to misappropriate documents from HCB and solicit customers in violation of his Agreement.  He also deleted, double-deleted, and purged emails and deleted documents leading up to his resignation.

64.    By way of example, Riggs purged sixty-six emails before he left.  Many of these relate to illustrations he was working on at the end of his employment with HCB.  There can be no reason to make the enormous effort of purging these emails, but to keep HCB from knowing what he was working on while he got his new practice up and running.

65.    Riggs's attempt to purge these emails amounts to the destruction of HCB's proprietary information.  It is not possible to accidentally purge emails – Riggs would have had to

delete each message, then clear his deleted items folder, and, finally, elect to purge a specific sub-set.

66.     In addition, Riggs deleted thousands of emails and hundreds of documents leading up to his resignation, in violation of HCB's policies.

67.     Riggs's actions have proximately caused, will continue to cause, and threaten to cause HCB substantial injury in the form of lost employee relationships, lost revenue, impairment of good-will and disclosure, misuse and loss of trade secret, confidential, and proprietary information.

## COUNT I -  BREACH OF CONTRACT

68.     HCB incorporates and re-alleges paragraphs 1 through 67 of this Verified Complaint as if those allegations are fully set forth in this paragraph.

69.     Based on the Agreement's choice-of-law provision, this claim is governed by Illinois law.  *See* Exhibit A, § 9.

70.     HCB and Riggs entered into a valid and enforceable contract, namely, the Agreement.  *See* Exhibit A.

71.     Riggs agreed to abide by the terms of the Agreement, including the non-disclosure and non-solicitation provisions contained therein.  *See* Exhibit A.

72.     The non-disclosure and non-solicitation restrictions are reasonable, and no greater than fairly required to protect and preserve HCB's legitimate protectable interests.

73.     HCB has complied with all of its obligations and conditions precedent under the Agreement.

74.     Riggs breached, and continues to breach, the Agreement by taking, and failing to return HCB's confidential, proprietary, and trade secret information upon his resignation.

75.     Riggs also breached, and continues to breach, the nondisclosure provisions in the Agreement by directly or indirectly using and/or disclosing confidential information revealed to and learned by Riggs.

76.     Riggs also breached, and continues to breach, the non-solicitation provisions in the Agreement by continuing to perform work for HCB clients.

77.     As a direct and proximate result of Riggs's breaches of the Agreement, HCB has sustained and continues to suffer damage.

78.     Riggs's conduct has also violated and threatens to continue to violate the legitimate protectable interests of HCB, including, but not limited to, its right to protect its confidential, proprietary, and trade secret information, and has caused, and will continue to cause, serious and irreparable harm and injury to HCB.

79.     No legal remedy can adequately protect HCB from Riggs's violation of the Agreement in that monetary damages are unascertainable, and, in any event, are on information and belief, beyond Riggs's ability to satisfy.  If Riggs is permitted to violate the Agreement, HCB's competitive advantage and profitability will be irreparably injured.  It will be impossible to measure that damage monetarily, as it will be impossible to determine, for example, which of Lion Street's strategic business decisions, including its desired growth under Riggs's leadership, among other things, were based on the confidential, proprietary, and trade secret information misappropriated, used, disclosed and not returned by Riggs.

80.     HCB faces immediate and irreparable harm as a result of the conduct described in this Verified Complaint, and injunctive relief is necessary to afford HCB adequate relief.

81.     The harm to HCB if injunctive relief is not afforded substantially outweighs the harm to Riggs if such relief is granted.

82.     There is a substantial likelihood that HCB will prevail on the merits.

83.     The public interest will be served by granting the requested relief in that the public policy supporting the ability to protect the secrecy of confidential, proprietary, and trade secret information will be upheld.  HCB has made substantial efforts to ensure the secrecy of its confidential, proprietary, and trade secret information, as described more fully above.

84.     HCB has already suffered lost business opportunities as a result of Riggs's violation of the non-solicitation agreement, and will continue to lose opportunities if injunctive relief is not awarded.

85.     Unless enjoined, Riggs's breaches of the Agreement will continue to cause irreparable harm to HCB for which HCB has no adequate remedy at law.

## COUNT II -  VIOLATION OF DEFEND TRADE SECRETS ACT

86.     HCB incorporates and re-alleges paragraphs 1 through 85 of this Verified Complaint as if those allegations are fully set forth in this paragraph.

87.     HCB owns, possesses, and developed over the years certain nonpublic, confidential and proprietary  information, including business contacts, customer lists, business plans and practices, marketing plans and practices, and other information related to its customers.

88.     HCB has made a reasonable effort and took reasonable steps to keep the information secret, including by: maintaining the information in a secure server requiring a username and password, by having its employees sign agreements to agree to maintain the confidentiality of the information, by maintaining policies and procedures to maintain the confidentiality of the information, and by taking steps to determine whether breaches of the information occurred and respond accordingly, and by taking legal action where necessary to protect the information.

89.     This confidential and proprietary information involves and relates to customers and involves and relates to services intended to be used in interstate commerce. HCB's information constitutes trade secrets within the meaning of the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1839.

90.     This information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

91.     In violation of HCB's rights, Riggs has misappropriated trade secret information in the improper and unlawful manner as alleged herein. Riggs's misappropriation of the trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

92.     If Riggs's conduct is not remedied, and if he is not enjoined, HCB will continue to use and/or disclose, for their own benefit and to HCB's detriment, HCB's trade secret information.

93.     As the direct and proximate result of Riggs's conduct, HCB has suffered and will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial, and is entitled to statutory exemplary damages and recovery of its attorneys' fees and costs.

94.     Because HCB's remedy at law is inadequate, HCB seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its trade secret information and other legitimate business interests.

## COUNT III:  VIOLATION OF MISSOURI UNIFORM TRADE SECRETS ACT

95.     HCB incorporates and re-alleges paragraphs 1 through 94 of this Verified Complaint as if those allegations are fully set forth in this paragraph.

96.     HCB's confidential and proprietary information, as described in herein, derives substantial, independent economic value, actual or potential, from not being generally known to,

17

or ascertainable by proper means by, other persons who can obtain economic value from its disclosure, such as HCB's competitors.

97.     HCB has made substantial and reasonable efforts to maintain the secrecy of HCB's confidential and proprietary information, including by requiring all employees who have access to such information to sign non-disclosure agreements, and by restricting access to such information.

98.     HCB's confidential and proprietary information, as described herein, are trade secrets.

99.     Because of his employment with HCB as a Sales Vice President, Riggs had knowledge of and access to the trade secrets under circumstances giving rise to a duty to maintain their secrecy, both because of the nondisclosure and other requirements in Riggs's Agreement, and his fiduciary duty and duty of loyalty to HCB as a Sales Vice President.

100.    Riggs has, without HCB's express or implied consent, misappropriated and/or threatens to misappropriate HCB's trade secrets.

101.    Based on his job responsibilities with Lion Street, Riggs has inevitably disclosed or used, or will inevitably disclose or use, HCB's trade secrets without HCB's express or implied consent.  His actions are undertaken with reckless indifference to HCB's rights.

102.    Riggs's misappropriation of HCB's trade secrets has caused and/or will cause irreparable injury to HCB and entitles HCB to temporary, preliminary, and permanent injunctive relief prohibiting Riggs from misappropriating (or enabling others to access or use) HCB's trade secrets, and requiring that Riggs return to HCB all materials constituting, reflecting or embodying such trade secrets.

103.    Riggs's misappropriations of HCB's trade secret information described herein is outrageous because of his evil motive and reckless indifference toward the rights of others, including HCB.

104.    As a direct and proximate result of Riggs's actions as described herein, HCB has sustained and continues to suffer damage.

105.    In addition, Riggs's misappropriation of HCB's confidential, proprietary and trade secret information has also caused HCB to suffer immediate and irreparable harm to HCB's business, customer relationships, employee relationships, goodwill, reputation, and ability to fairly compete in the marketplace.

106.    Unless enjoined, Riggs's misappropriations of HCB's confidential, proprietary, and trade secret information will continue to cause irreparable harm to HCB for which it has no adequate remedy at law.

## COUNT IV– VIOLATION OF MISSOURI COMPUTER TAMPERING ACT ("MCTA")

107.    HCB incorporates and re-alleges paragraphs 1 through 106 of this Verified Complaint as if those allegations are fully set forth in this paragraph.

108.    Prior to resigning from HCB, Riggs knowingly and without authorization, moved hundreds of documents to his computer's Recycling Bin, for the purpose of deleting them from HCB's shared OneNote Drive.

109.    Prior to resigning from HCB, Riggs knowingly and without authorization, deleted thousands of emails.  Riggs also took the additional steps of double deleting and purging many emails at the end of his employment.

110.    Prior to resigning from HCB, Riggs took and/or disclosed data housed on his HCB computer, including but not limited to, copying hundreds of documents to his personal device.

111.    The full scope of Riggs's taking and attempted deletion of documents and emails prior to resigning is as yet unknown.

112.    As a direct result of Riggs's improper actions, HCB has incurred necessary expenses to attempt to recover items deleted by Riggs and to learn the details of documents he copied to his personal device.

## PRAYER FOR INJUNCTIVE RELIEF AND DAMAGES

WHEREFORE, HCB demands the following:

a.    For Count I, temporary, preliminary, and permanent injunctions restraining and enjoining Riggs from continuing to breach the Agreement, specifically enforcing the Agreement, and for actual damages to be proven at trial;

b.    For Count II, temporary, preliminary, and permanent injunctions restraining and enjoining Riggs from using and/or disclosing HCB's trade secrets and/or Confidential Information, order Riggs to return HCB's trade secrets and/or Confidential Information to HCB, and ordering Riggs to turn over for forensic inspection and review any electronic devices which contain HCB trade secrets or Confidential Information and for actual and punitive damages to be proven at trial;

c.    For Count III, temporary, preliminary, and permanent injunctions restraining and enjoining Riggs from using and/or disclosing HCB's trade secrets and/or Confidential Information, order Riggs to return HCB's trade secrets and/or Confidential Information to HCB, and ordering Riggs to turn over for forensic inspection and review any electronic devices which

contain HCB trade secrets or Confidential Information and for actual and punitive damages to be proven at trial;

d.    For Count IV, compensatory damages for the expense incurred completing a necessary investigation into his computer tampering;

e.    Reasonable attorneys' fees and costs; and

f.    Such other and further relief as this Court may deem just and proper.

## <u>VERIFICATION</u>

STATE OF ALABAMA    )
                                   )
CITY OF BIRMINGHAM   )

     Drew Lawrence, EVP and Chief Financial Officer of Highland Capital Brokerage, Inc., being duly sworn on his oath, states that he has read the foregoing Verified Petition and that the statements contained therein are true and accurate based on personal knowledge and belief and his review of Highland Capital Brokerage's business records unless otherwise stated.

_____
Drew Lawrence

Subscribed and sworn before me this __8th__ day of July, 2020.

_____
Notary Public

LAURA M. JACKMAN
My Commission Expires
March 27, 2021

22

Respectfully submitted,


*/s/ Harry W. Wellford, Jr.*

Harry W. Wellford, Jr. #32305
hwellford@littler.com
Becky M. Christensen #62798
bchristensen@littler.com
LITTLER MENDELSON, P.C.
600 Washington Avenue
Suite 900
St. Louis, MO  63101
Telephone: 314.659.2000
Facsimile: 314.659.2099

Attorneys for Plaintiff Highland Capital
Brokerage, Inc.

4822-3225-5168.15